**RICHARDSON et al. v. UNITED STATES.**

No. 49144.

United States Court of Claims.

Nov. 7, 1949.

John W. Gaskins, Washington, D. C., for the plaintiffs. King & King, and Herman J. Galloway, Washington, D. C. were on the brief.

John F. Ganong, Washington, D. C., with whom was Acting Assistant Attorney General Newell A. Clapp, for the defendant.

Before JONES, Chief Judge and WHITAKER, LITTLETON, MADDEN and HOWELL, Judges.

WHITAKER, Judge.

This case is before us on demurrer to plaintiffs' petition.

Plaintiffs allege that on November 18, 1940, they entered into a contract with the defendant for the construction of a reinforced concrete building known as the Astoria Control Station, Astoria, Oregon; and that on September 7, 1940, plaintiff David A. Richardson entered into a contract for the construction of rearing ponds, etc., at the Winthrop Station, Columbia Basin Project in the State of Washington; and that on May 29, 1941, plaintiffs entered into a contract for the construction of rearing ponds at the Columbia Basin Project in the State of Washington; and that on October 7, 1941, they entered into a contract with the defendant for the construction of canals, pipe lines, earthwork, etc., at Roza Division, Yakima Project in the State of Washington; and that on June 20, 1944, plaintiffs entered into a contract for the construction of a reinforced concrete flume and bridge at Crooked River Crossing, North unit, Main canal, DeSchutes Project in the State of Oregon. They say they lost money on each of these contracts without any fault or negligence on their part. They further allege that they had another contract with defendant for the construction of rearing ponds, etc., at Colman Station, Kennett Division, Central Valley Project in the State of California. On this contract they say they made money, but that on all six of the contracts they sustained an aggregate net loss.

There is no allegation that these contracts had anything to do with the prosecution of the late war.

Plaintiffs attach as an exhibit to their petition the decision of the Acting Assistant Secretary of Interior on their claims. The secretary denied four of them on the ground that they "had no relationship to the national defense program whatsoever." (The

quotation is from the decision on the first contract. Similar statements are made relative to the others.)

The claim on the contract for the construction of the reinforced concrete flume and bridge at Crooked River Crossing was neither allowed nor denied. The Assistant Secretary thought that it did have some relation to the defense program, but he felt that he did not have sufficient information on a certain phase of the claim to enable him to render a decision, and he requested further information.

The defendant demurs on the ground that the first four contracts had no relation to the defense program and, with respect to the fifth contract, on the ground that the suit was premature in that no administrative decision had been rendered on the claim filed under it. We think both of the grounds asserted by defendant are well taken.

Plaintiffs' suit is based upon what is known as the "Lucas Act," being the Act of August 7, 1946, ch. 864, 60 Stat. 902, 41 U.S.C.A. § 106 note. This Act provides, in part:

"That where work, supplies, or services have been furnished between September 16, 1940, and August 14, 1945, under a contract or subcontract, for any department or agency of the Government which prior to the latter date was authorized to enter into contracts and amendments or modifications of contracts under section 201 of the First War Powers Act, 1941 (50 U.S.C.Supp. IV, app., sec. 611), such departments and agencies are hereby authorized * * * to consider, adjust, and settle equitable claims of contractors * * * for losses (not including diminution of anticipated profits) incurred between September 16, 1940, and August 14, 1945, without fault or negligence on their part in the performance of such contracts or subcontracts. * * *"

Plaintiffs say that this Act authorizes these departments to settle claims for losses on contracts entered into between the specified dates whether or not these contracts had any relation whatever to the war effort. All that is necessary, they say, is that they should have entered into a contract of any sort between these dates and to have lost money on them without their fault or negligence.

It would take explicit language to convince us that Congress had any such intent. True it is that Congress has been most bountiful in its distribution of largess, but, even so, we cannot believe that it intended to say to any contractor whatsoever, irrespective of the nature of his contract: If you lost money on your contract, without your fault or negligence, we will reimburse you for your loss, provided only that the contract was one entered into between September 16, 1940, and August 14, 1945.

From a reading of the Act and the legislative history behind it, we are convinced that Congress had no such intent. The Lucas Act is a supplement to section 201 of the First War Powers Act, 50 U.S.C.A. Appendix, § 611. The First War Powers Act gave the President authority to "authorize any department or agency of the Government *exercising functions in connection with the prosecution of the war effort*" [Italics ours] to amend or modify a contract "whenever he deems such action would facilitate the prosecution of the war". The agencies authorized by the Lucas Act to settle claims for losses in the performance of contracts were those agencies designated in the First War Powers Act as those "exercising functions in connection with the prosecution of the war effort". The Lucas Act says that where work, supplies, or services have been furnished "for any department or agency of the Government which prior to the latter date was authorized to enter into contracts and amendments or modifications of contracts under section 201 of the First War Powers Act, 1941", the department or agency may consider the contractor's claim for losses. These departments and agencies were those "exercising functions in connection with the prosecution of the war effort". This indicates rather clearly that Congress, in the passage of the Lucas Act, had in mind losses sustained on contracts entered into "in connection with the prosecution of the war effort".

The legislative history of the Lucas Act leaves little doubt of this. The first sentence of Report No. 1669 on this Act by the Committee on the Judiciary of the Senate reads:

This bill, as amended, would afford financial relief to those contractors who suffered losses *in the performance of war contracts* in those cases where the claim would have received favorable consideration under the First War Powers Act and Executive Order No. 9001 if action had been taken by the Government prior to the capitulation of the Japanese Government. * * * [Italics ours.]

The first sentence of Report No. 2576 on the Act submitted by the Judiciary Committee of the House of Representatives contains almost identical language. It is evident, therefore, that the committee members, at least, in proposing the Lucas Act had in mind losses sustained on war contracts and not on contracts generally. There is nothing to indicate that Congress as a whole had any other intention.

These reports go on to show that some of the agencies of the Government refused to afford a contractor any relief after the Japanese surrender, because of the fact that the First War Powers Act gave them authority to amend or modify a contract only when the head of the department "deems such action would facilitate the prosecution of the war", and these departments were unable to see how the amendment of a contract after the Japanese surrender could be said to facilitate the prosecution of the war. The Senate Report said that to remedy this situation the Lucas Act was being proposed. It said:

The committee has concluded that as a matter of sound legislative policy this bill, as amended, should pass, as its adoption is the only way to afford a means of considering, adjusting, and settling equitable claims of the contractors affected.

It is true we have held that the relief which can be given under the Lucas Act is broader than the relief afforded under the First War Powers Act, but it is plain that both of the Acts intended to afford relief only on contracts entered into "in connection with the prosecution of the war effort."

Of course what individual Senators had to say in the hearings on the bill are not of a great deal of assistance in determining what Congress intended in the enactment of the bill, but it is interesting to note that these statements are in line with the committee reports. For instance, on page 39 of the report of the Hearings the Chairman of the committee, said:

If, at the time the contractor sustained the loss, he was in the act of assisting in the prosecution of the war or the war effort, that is the spirit in my judgment of the law.

And again he said on page 66:

All the Government wants to do is to deal fairly with those who aided the Government in its great struggle.

It is true that Senator Revercomb thought the Act ought not be be limited to war contracts, but he apparently was in the minority, and he did not persist in his views, since he did not offer a minority report, although the committee report showed clearly that the committee had in mind only losses sustained "in the performance of war contracts."

In the following Congress the Lucas Act was amended so as to confer jurisdiction on this court where the claim exceeded $10,000. In the explanation of the amendment the committee said:

Public Law No. 657 of the Seventy-ninth Congress provides for the determination of *war claims* incurred without fault or negligence where any form of contract relief had been requested during the war and despite former administrative denial or settlement thereof. * * * (Italics ours.)

It appears, therefore, that the succeeding Congress thought that its predecessor, in the passage of the Lucas Act, had in mind losses sustained on war contracts and not on contracts generally.

While this specific question has not been heretofore presented to this court, we have nevertheless taken for granted that the Lucas Act had reference to contracts "in connection with the prosecution of the war effort". See Howard Industries v. United States, 83 F.Supp. 337, 113 Ct.Cl. 231, and kindred cases decided at the same time.

Plaintiffs' petition, therefore, is fatally defective, in that it does not allege that these contracts were entered into in connection with the prosecution of the war effort. This allegation was apparently necessarily omitted, since plaintiffs do not in their brief argue that they were entered into connection with the war effort, but ground their argument alone on the proposition that the Lucas Act applies to contracts generally, and not only to those entered into in connection with the prosecution of the war. From the statements made in the administrative decision, it would appear that four of the contracts did have no relation to the prosecution of the war.

■ With reference to the fifth contract defendant says that the suit is premature since there has been no administrative decision on plaintiffs' claim. This appears to be true. The Secretary neither allowed nor denied it, but gave the plaintiffs further opportunity to supply information which he thought was necessary to enable him to render a decision. Plaintiffs wrote the Secretary of the Interior on May 5, 1949, after they had filed suit in this court, stating that they were not abandoning their claim before the department but expected to proceed with it.

The Lucas Act permits a contractor to bring a suit against the Government only after the administrative decision has been rendered. Section 6 of the Act, as amended, provides:

"Whenever any claimant under this Act is dissatisfied with the action of a department or agency of the Government in either granting or denying his claim, such claimant shall have the right within six months to file a petition with the Court of Claims * * *."

It is evident, therefore, that the administrative agency must act before a petition can be filed in this court.

The purpose of the Dent Act, 50 U.S.C.A. following section 80, passed after the First World War, was similar to the purpose of the Lucas Act. In United States Bedding Co. v. United States, 55 Ct.Cl. 459, we held that this court did not have jurisdiction under the Dent Act until after the administrative agency had rendered its decision. On page 461 of 55 Ct.Cl. the court says of that Act:

It provides that the Secretary may make settlement upon a fair and equitable basis. The Government is entitled to his judgment; the claimant is entitled to know what he regards as a fair and equitable settlement; and the Court of Claims, if the matter be brought to it by a petition of a dissatisfied claimant, is entitled to know what the Secretary of War thought of the claim.

It seems clear to us that we have no jurisdiction of an action under the Lucas Act until after the head of the department has acted on the claim.

Of course we have not before us a case where the department refuses to act or delays unreasonably in doing so.

Defendant's demurrer is sustained, and plaintiffs' petition is dismissed. It is so ordered.

HOWELL, MADDEN, and LITTLETON, JJ., and JONES, C. J., concur.