## JARDINE MINING CO. v. UNITED STATES.

No. 48890.

United States Court of Claims.

Jan. 3, 1950.

Carl McFarland, Washington, D. C., Mc-Farland & Sellers, Washington, D. C., on the brief, for plaintiff.

Robert E. Mitchell, Washington, D. C., H. G. Morison, Asst. Atty. Gen., Warren T. Faircloth, Washington, D. C., on the brief, for defendant.

266

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

HOWELL, Judge.

Plaintiff's petition contains two alternate causes of action and defendant has moved to dismiss each.

Plaintiff's first cause of action is based on the War Contract Hardship Claims Act, otherwise known as the Lucas Act of August 7, 1946, 60 Stat. 902, 41 U.S.C.A. § 106 note. The case has been transferred to this court from the United States District Court for the District of Columbia for original disposition pursuant to election by the plaintiff, as authorized by Section 6 of the Lucas Act, as amended June 25, 1948, Public Law 773, 80th Congress, 62 Stat. 869.

The Government, prior to transfer, had filed a motion for summary judgment in the district court. This motion was granted on May 25, 1948.[1]

Pursuant to Rule 39½ (1) (b) of the Rules of the Court of Claims, 28 U.S.C.A., plaintiff elected to replead by filing a new petition in this court. The new petition, which differs somewhat from the petition filed in the district court, alleges that by contract dated June 17, 1943 with the Metals Reserve Company (No. MR C–1 P–2095), plaintiff agreed to sell and deliver to the Government not to exceed 10,000,000 pounds of refined white arsenic produced from its mining property at Jardine, Montana, at a price of 6 cents per pound ($600,-000 if maximum deliveries were made); that pursuant to said contract plaintiff furnished work, supplies and services during the period of June 17, 1943, to August 14, 1945, and without fault or negligence on its part incurred a loss of $1,214,887.05, which it is equitably entitled to recover under the provisions of the Lucas Act; that at various times between those dates plaintiff had filed numerous requests for relief respecting such losses with the Government agencies concerned, including Metals Reserve Company; that such requests sought relief of the type customarily granted by such agencies under Sec. 201 of the First War Powers Act, 1941, 50 U.S.C.A. Appendix, § 611, and were pending before the agencies on August 14, 1945; that on February 6, 1947, plaintiff filed with Reconstruction Finance Corporation (successor of Metals Reserve Company) its claim for losses under the Lucas Act, which claim was denied on March 25, 1947; that on July 11, 1947, plaintiff, pursuant to Section 6 of the Lucas Act, filed a petition in the United States District Court for the District of Columbia to obtain a determination of the amount to which it was equitably entitled; that pursuant to Section 6 of the Lucas Act as amended plaintiff transferred this case to the Court of Claims for original disposition and, upon proper notice, elected to replead by filing a new petition.

Defendant's motion to dismiss plaintiff's first cause of action is based first upon the ground that plaintiff's alleged cause of action under the Lucas Act is not founded upon a claim for losses *with respect to which a written request for relief was filed* with the agency concerned on or before August 14, 1945, and is therefore barred by Section 3 of the Lucas Act and by the President's regulations issued thereunder. Executive Order 9786, Oct. 5, 1946, 11 F.R. 11553–6, 3 CFR, 1946 Supp., 165, Nos. 204 and 202 (e).

Section 3 of the Lucas Act provides in part as follows:

"Claims for losses * * * shall be limited to losses with respect to which a written request for relief was filed with such department or agency on or before August 14, 1945."

Paragraph 204 of Executive Order 9786 provides in part as follows:

"No claim for loss under any contract or subcontract of a war agency shall be received or considered unless a written request for relief with respect thereto was filed with such war agency on or before August 14, 1945; * * *."

Paragraph 202 provides in part:

"Each claim shall be in writing and shall contain or shall be accompanied by: * *

1. D.C.D.C., Civ.No.2843–47.

"e. A copy of each written request filed on or before August 14, 1945, with the war agency concerned, for relief with respect to the losses claimed."

Defendant contends that the statement in plaintiff's petition that it "filed numerous written requests for relief with respect to its aforesaid losses" is not a sufficient compliance with the above quoted provision of the act and with the regulations. Defendant seems to believe that the petition should have set forth the facts concerning the requests for relief or should have had attached thereto copies of each written request.

■ We see nothing in Section 3 of the act requiring plaintiff to attach as part of its petition, copies of the requests for relief relied on. Neither do we believe this section requires the setting forth of the facts concerning these requests for relief. We can readily understand that it might have been desirable for the statute to have made such a requirement inasmuch as the final recovery will depend on the existence and validity of requests for relief with respect to the losses claimed. It may have been for this reason that the Executive Order required in paragraph 202 (e) that each claim should be accompanied by copies of every written request for relief with respect to the losses claimed. However, the regulations authorized by Section 1 of the act are applicable to the departments and agencies authorized to consider, adjust and settle equitable claims arising under this act and not to this court. Section 3 of the act provides simply that the claims for losses shall be limited to losses with respect to which a written request for relief was filed with the proper agency within the statutory period. We conclude, therefore, that plaintiff's allegation in its petition that it "filed numerous requests for relief with respect to its aforesaid losses" is a sufficient compliance with Section 3 and that the petition does spell out a cause of action under the Lucas Act.

■ In its brief, defendant has set forth the letter which it supposes plaintiff relies on as being a "request for relief" with respect to the losses claimed and goes on to argue that it is not the sort of request for relief contemplated by the act. If the letter had been made a part of the petition or had been described therein, we would be at liberty to consider this argument as we did in the case of Howard Industries, Inc. v. United States, 83 F.Supp. 337, 113 Ct.Cl. 231. However, as the petition is drawn, the letter in question is not before us and cannot be considered on a motion to dismiss.

■ Finally, defendant contends that in any event the petition must be dismissed because (1) plaintiff's claim was not pending and undisposed of on August 14, 1945, its letter "request for relief" of December 14, 1944, having been refused by the contracting agency on January 5, 1945, and (2) the claim was not one which would have received favorable consideration under the First War Powers Act.

The first ground presumes that a letter of December 14, 1944, from plaintiff to Metals Reserve Company is the "request for relief" referred to in plaintiff's petition, apparently because that letter was described and relied on both in plaintiff's claim before that agency and in plaintiff's petition in the district court action. If plaintiff had elected to proceed to trial and judgment in this court on the pleadings filed in the district court prior to transfer, we would have to dispose of this argument. Plaintiff did not so elect, but chose to replead its case and in its new petition filed in this court the letter is neither described nor referred to.

Defendant's second ground is based on paragraph 307 of Executive Order 9786, which regulation we held to be invalid and in direct conflict with the terms of the act. Howard Industries, Inc. v. United States, supra.

■ From the above, we conclude that plaintiff's petition has set forth a cause of action within the provisions of the Lucas Act and the defendant's motion to dismiss the first cause of action is accordingly overruled.

Defendant also moves to dismiss plaintiff's petition as to the second cause of action based on an alleged breach of contract. Defendant contends that the petition dis-

closes no breach of contract on defendant's part.

In support of its second cause of action, plaintiff alleges that its contract with Metals Reserve Company called for delivery of 10,000,000 pounds of refined white arsenic at the rate of one-half the total quantity during the first 18 months following the contract date of June 17, 1943, and the remaining 5,000,000 pounds during the 12 months next ensuing; that plaintiff was prevented and delayed from delivering arsenic during the 18-month period and "at various other times" by the occurrences, without fault or negligence on its part, of "numerous conditions specified in the *force majeure* provision of the contract"; that pursuant to that provision plaintiff was entitled to a time extension of approximately 18 months in which to make contract deliveries but that the government, though fully aware of the causes of prevention and delay of which it was kept informed at all times, notified plaintiff by letter, dated January 4, 1946, of its decision not to receive the undelivered portion of the arsenic as of that date and that plaintiff sustained losses in the performance of the contract of $1,214,887.05 which it is entitled to recover. Plaintiff then sets forth the causes of delay which, on their face appear to be of the sort contemplated by the *force majeure* provision of the contract.

With respect to this claim, the contract provides in part as follows:

### "Delivery Schedule

"Deliveries of the material deliverable hereunder shall be made in accordance with the following schedule:

"(a) Not less than 5,000,000 pounds to be delivered within 18 months from date of execution of this Contract; and

"(b) 5,000,000 pounds to be delivered within the next ensuing 12 months; such ensuing 12 months' period to commence 18 months after date of execution of this Contract. [The date of execution was June 17, 1943.]

### "Shipments

"Shipments of the material shall commence approximately January 1, 1944 (after completion of mill construction and the installation of necessary facilities), at the rate of approximately 400,000 pounds per month. However, it is hereby understood and agreed that the quantities, as set forth in the above-entitled paragraph 'Delivery Schedule' shall be shipped within the periods of time, as therein specified. * * *

### "Force Majeure

"Prevention or delay in the performance hereof caused by act of nature, strike, fire, flood, traffic interruption, delay in transportation, war, insurrection or mob violence, requirement or regulation of Government, cessation of operation at smelter for failure of ore supply operating requirement, or any disabling cause, without regard to the foregoing enumeration, beyond the control of either party, shall entitle the party affected to suspend this agreement. A suspension of performance pursuant to this clause shall not have the effect of abrogating the agreement, but immediately upon the termination of the cause of disability all the provisions thereof shall again come into full force and effect and the time of performance of the agreement shall be extended for a period equal to the period of suspension, but in no event shall such extended period be of longer duration than the unexpired term of the agreement at the time of suspension. Nothing contained in this paragraph shall be construed to permit Seller to make up any deficiencies in the delivery schedule, contrary to the paragraph entitled 'Special Conditions.'

\* \* \* \* \* \*

### "Special Conditions

"It is hereby understood and agreed between Buyer and Seller that time is of the essence in this Contract and that any deficiencies resulting from failure by Seller to deliver material in accordance with the provision '(a)' of the paragraph entitled 'Delivery Schedule,' cannot be made up by deliveries under the provision "(b)" of said paragraph 'Delivery Schedule.'

\* \* \* \* \* \*

### "Cancellation

"Notwithstanding any other provision hereof, Buyer may cancel this Contract,

without payment of any damages or penalties for such cancellation, with respect to any material remaining undelivered afer January 1, 1946."

"Exhibit A" attached to the contract and referred to in the provision entitled "Standard Provisions," provided that the Government could, by notice in writing to the contractor, cancel the contract or any part of it at any time without the payment of damages or penalty of any kind for such cancellation in the event of the contractor's insolvency, or liquidation, or a determination that the contractor had obtained the contract for purposes of speculation, or in the event of default by the contractor in the perfomance of any of the terms of the contract and its failure to cure such defect within 30 days of receiving written notice of its default from the Government.

Plaintiff contends that upon the happening of certain events enumerated in the *force majcure* provision of its contract, the contract was suspended and plaintiff thus became entitled to an 18 months' extension of the time in which it was required to make deliveries under the contract;[2] that defendant's cancellation of the contract on January 4, 1946 (16 days after the termination date set in the contract but within the contract performance time as extended by operation of the *force majcure* clause), prevented plaintiff from completing performance and damaged it in the amount claimed. Plaintiff argues that it cannot be deprived

of its right to continue making deliveries for the entire contract term as extended by the invocation of the clause providing for cancellation after January 1, 1946; that permitting defendant to cancel under the circumstances results in construing the cancellation clause as a limitation on the *force majeure* clause to the point where the *force majeure* clause has no meaning. Plaintiff urges that the contract should be read so as to give effect to all its parts.

We do not believe that the cancellation clause in question negatives the *force majcure* clause nor that defendant's election to cancel on January 4th, 1946, constitutes a breach of the contract because of the extension provisions of the *force majcure* clause. The setting of the date on which the Government might for the first time exercise such an option to cancel 13 days after the date specified for completion of deliveries under the contract, recognizes the fact that the contract might be extended beyond December 18, 1945. There is nothing in the contract limiting the length of the suspensions and thus the time for completion of the contract might be extended almost indefinitely. In the absence of the cancellation clause the Government would be unable to terminate its obligation to accept deliveries of arsenic unless one of the events provided for in the Standard Provisions clause occurred, such as plaintiff's default or insolvency. It is inconceivable that the parties should have intended any

2. Plaintiff's petition does not indicate the dates of the beginnings and endings of the suspensions occurring under the *force majeure* clause. It is therefore impossible to tell when the 18 months' extension to which plaintiff claims it is entitled would finally terminate. In any event, it would certainly be long after the termination date which was to be 30 months after execution of the contract on June 17, 1943, i. e., December 18, 1945. The following example will illustrate what could have occurred to result in the alleged 18 months' extension. Assume the first suspension occurred during the first 18 month period (hereinafter called the (a) period) on June 17, 1944, and ended on June 17, 1945. This is a 12-month suspension, but because the (a) delivery period had only 6 months left

to run on the date the suspension started, plaintiff would only be entitled to an extension of 6 months as to the (a) period. This would result in plaintiff's having until December 17, 1945, to complete the first or (a) period work. Next assume that on December 17, 1945, another suspension started which lasted until December 17, 1946, or a period of 12 months. On the date the suspension started, the (b) period (the second or 12-month delivery period) still had 12 months to run and therefore plaintiff would be entitled to a 12 months' extension beginning on December 17, 1946. This would extend plaintiff's time of performance to December 17, 1947, with respect to the (b) period of the delivery schedule.

such result, especially in view of the fact that the contract expressly makes time of the essence. The very nature of the transaction and its surrounding circumstances—the sale of essential materials to the Government in time of war—further indicate the importance of the time factor. Undoubtedly the Government needed the arsenic and needed it approximately at the times specified in the contract. If plaintiff could not, within a reasonable time, provide the arsenic that it had contracted to provide, the Government would have to fill its requirements elsewhere. By placing in the contract the cancellation clause in question, the Government was guarding against the possibility of having to accept deliveries of arsenic many years after the war had come to an end and its need for the product had terminated. The provision *permitting* cancellation after the date on which all the arsenic was to have been delivered had there been no suspensions, seems to us to have been a very reasonable one and a most necessary one in view of the impossibility of placing any limit on the length of suspensions which might arise under the *force majeure* clause of the contract.

■■ Plaintiff also argues that the cancellation clause is invalid on the authority of Peninsular Stove Co. v. United States, 58 Ct.Cl. 36, cited in Williston on Contracts, Vol. 9, sec. 116. The cancellation clause in that contract provided that "any part of this order may be cancelled *at any time* without obligation to the United States Government." The contract involved the manufacture and sale of 500 ranges to the Government. Approximately one month after the execution of the contract, the Government cancelled pursuant to the above quoted cancellation language. Plaintiff had commenced manufacture and the court allowed recovery of the amount expended in carrying out the contract less the amount plaintiff salvaged. Such a clause permitting the buyer to cancel *at any time* without obligation, renders the buyer's promise to accept delivery and pay for the articles, illusory and the court will not uphold such a clause. In the instant case, however, there was nothing illusory about the Government's obligation to accept deliveries and pay for them for the full 30-month term defined in the contract and for a possible extended period of 13 days. The cancellation clause does not attempt to absolve the Government from any obligations which might have accrued prior to cancellation but only "with respect to any material remaining undelivered after January 1, 1946." We conclude that the cancellation clause in this contract is a valid one, not inconsistent with the other terms of the contract, and that the Government did not breach the contract by cancelling it on January 4, 1946, in accordance with the terms of the cancellation clause, in spite of the fact that the contract term may have been extended by operation of the *force majeure* clause of the contract.[3]

Plaintiff's petition does not state a cause of action based on the contract, and accordingly the motion to dismiss is granted with respect to plaintiff's second cause of action.

JONES, Chief Judge, and MADDEN, WHITAKER, and LITTLETON, Judges, concur.

3. In its brief plaintiff states that "defendant's interpretation and action in this case flies in the teeth of the Contract Settlement Act of 1944 * * *" and that defendant has "grossly departed from the solemnly proclaimed and authoritative policy of the United States with reference to termination of war contracts." Plaintiff's petition nowhere mentions the Contract Settlement Act, 41 U.S.C.A. § 101 et seq., and has not, by its terms, presented its claim in accordance with the provisions of that Act.

In Stevens v. Federal Cartridge Corporation, 1948, 226 Minn. 148, 32 N.W.2d 312, the court held that it was the intention of Congress in passing the Contract Settlement Act to make an attempt to settle contract claims thereunder, a condition precedent to the bringing of an action in a court of law, both for prime contractors and for subcontractors. Plaintiff's petition does not allege any attempt to settle its claim under the provisions of that Act.